| | | |
|---|---|---|
| MIDWEST TRADING GROUP, INC., | ) | |
| | ) | |
| | ) | No. 12 C 9313 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| GLOBALTRANZ ENTERPRISES, INC.; | ) | |
| AMERICAN FREIGHT NETWORK, INC.; | ) | |
| AKOP KARAPETAN d/b/a V & R TRUCKING; | ) | |
| and EVERTEK, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Midwest Trading Group, Inc. ("Midwest") seeks recovery against GlobalTranz Enterprises, Inc. ("GlobalTranz") for a loss arising out of the theft of two shipments of Android tablet computers during interstate motor transit. Other Defendants in the case, American Freight Network, Inc. ("American Freight"), AKOP Karapetan d/b/a V & R Trucking, Inc. ("V & R Trucking"), and Evertek, Inc. ("Evertek"), have not participated in the case and do not have an attorney appearance on file. It also appears that they have never been served. GlobalTranz has moved for summary judgment. For the reasons discussed below, GlobalTranz's motion for summary judgment, R. 18, is granted in part and denied in part.

## BACKGROUND

In late January 2012, West Coast Imports, Inc. ("West Coast"), acting as Midwest's agent, contacted GlobalTranz in order to arrange for the shipment of two loads of Android tablet computers. R. 1-1 ¶ 9; R. 30 ¶ 5. West Coast and Midwest

had previously conducted business with GlobalTranz. Midwest had directly utilized GlobalTranz's services on one prior occasion, R. 20-2 ¶ 11; R. 20-3 at 18; while West Coast had previously booked over 100 shipments with GlobalTranz on various occasions for other customers. R. 36-2 ¶ 10; R. 36-5. On the bottom of "GlobalTranz's Credit Application," a document that is provided to the parties GlobalTranz does business with, the following language appears:

> THE ABOVE INFORMATION is for the purpose of obtaining credit and is warranted to be true. I/we hereby authorize the firm to whom this application is made to investigate the references listed pertaining to my/our credit and financial responsibility. A copy of this document shall be the original. BY SIGNING THE APPLICATION, THE APPLICANT CONSENTS TO THE TERMS AND CONDITIONS FOUND ON WWW.CARRIERRATE.COM.

*Id.* at 1-2. Similar language appears on many payment invoices that are sent to parties after a shipment has been processed. R. 45 ¶ 2. Carrierrate.com is GlobalTranz's website. On the website are the "Freight Broker Agreement Terms and Conditions" ("the "Terms and Conditions"). *See* R. 20-3 at 19-22. As discussed in more detail below, these Terms and Conditions contain various clauses regarding liability, insurance, a disclaimer of warranties, and rates. *Id.* In particular, paragraph 10, which contains an insurance disclaimer, provides that "GlobalTranz may have optional Shippers Interest Contingent Cargo Liability Insurance ('Third Party Insurance') available for purchase by Customer.'" R. 20-3 at 20.

GlobalTranz has submitted a copy of the credit application that was allegedly signed in May 2010 by an agent of West Coast (Nuria Coronado, a West Coast employee) and another that was allegedly signed by an agent of Midwest (Rashid

Aziz, President of Midwest) in August 2010. R. 20-2 ¶¶ 3-4; R. 20-3 at 1-2. Both Coronado and Aziz deny having signed the credit application.[1] R. 25-3; R. 25-4. Nevertheless, GlobalTranz contends that West Coast was aware of the language referring to the Terms and Conditions due to the numerous invoices that it received for other shipments. R. 45 ¶¶ 1-4

Regarding the shipments at issue here, one load of Android tablets was to be transported to zip code 78218, R. 20-3 at 34; the second load was to be transported to zip code 27536, *id.* at 31. Gengler, on behalf of GlobalTranz, quoted Coronado, on behalf of West Coast, a price, which the parties agreed upon. Gengler and Coronado reached the agreement through direct email correspondence. R. 44-1 ¶ 3. According to the sworn declaration of Vinay Saboo, the President of West Coast, West Coast was told that GlobalTranz would purchase insurance on the shipments. R. 29-2 ¶ 6. Coronado also said that it was her "understanding based on [her] experience with GlobalTranz that the quote [for the shipments] included the cost of insurance." R. 44-1 ¶ 4. Gengler denies that GlobalTranz ever offered West Coast such insurance for the shipments. R. 30 ¶ 8. The invoices do not list "insurance" under the description of services included and there is no explicit charge listed for insurance. R. 20-3 at 17-18. Midwest claims that it would not have entered into the shipping agreement with GlobalTranz if insurance had not been included in the transaction. *See* R. 29-1 ¶ 4.

---

[1] GlobalTranz now claims that Shawn Gengler, a GlobalTranz employee, prepared and signed the credit applications "with the authorization of West Coast and Midwest." R. 45 ¶ 21.

At some point, GlobalTranz issued two "short form" bills of lading for the shipments to "Westcoast Imports." R. 20-3 at 13-14. It is unclear as to when exactly they were issued. One "long form" bill of lading was issued to "MIDWEST TRADING GROUP C/O WCI"; another was issued to Midwest Trading Group, C/O West Coast Imports." *Id.* at 15-16. GlobalTranz was listed as a third party on the long form bill of lading for the second load—i.e., the shipment to zip code 27536.[2] *Id.* at 15.

After GlobalTranz accepted the order, which was placed by Midwest through West Coast, GlobalTranz brokered the shipment of the loads to American Freight. R. 8 ¶ 14. American Freight re-brokered the shipment of the loads to V & R Trucking. *Id.* ¶ 15. A few days later, on February 2, 2012, a driver for V & R Trucking picked up the two loads of Android tablet computers. R. 1-1 ¶ 16. Shortly thereafter, while the driver was out of the truck eating lunch, the tractor and trailer containing the tablets were stolen. *Id.* ¶ 17. Midwest alleges that "Evertek came into possession of part of the stolen loads" at some point and later sold them. *Id.* ¶¶ 42-43.

Gengler and Saboo exchanged emails on February 2, 2012, after the Android tablets were stolen. R. 44-3. As discussed further below, Saboo raised the issue of insurance on the loads, to which Gengler responded in a manner indicating that West Coast had indeed purchased insurance. *Id.* Midwest eventually submitted a

---

[2] The "long form" bills of lading contain more specific information about the particular loads to be shipped and the shipping instructions. *Compare* R. 20-3 at 13-14, *with id.* at 15-16.

claim to GlobalTranz for $170,000 for the first load, R. 20-3 at 33, and for $440,000 for the second, *id.* at 30. Midwest contends that it never received any compensation in return for its claims. R. 32-2 ¶ 12.

Midwest filed this suit in the Circuit Court of Cook County, Illinois, on November 20, 2012. R. 1. GlobalTranz removed the suit to federal court on November 21, 2012, R. 6, and the case was reassigned to the undersigned Judge on January 14, 2013. R. 14. The complaint includes four counts. Count I is for fraud against GlobalTranz. Count II is for negligence against GlobalTranz, American Freight, and V & R Trucking. Count III is for breach of contract against GlobalTranz. Count IV is for unjust enrichment against Evertek. No motion to dismiss was ever filed, and limited discovery was taken. Certain documents and affidavits have been submitted in support of, and in opposition to, GlobalTranz's motion for summary judgment as to Counts I, II, and III.

## LEGAL STANDARD

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, the non-moving party must produce more than a "mere scintilla of evidence," meaning "evidence on which [a] jury could reasonably find for the non-moving party." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In ruling on the motion, the Court considers

the entire evidentiary record and "view[s] all facts and draw[s] all inferences in the light most favorable to the non-moving party." *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013); *Egan Marine Corp. v. Great Am. Ins. Co.*, 665 F.3d 800, 811 (7th Cir. 2011).

When federal court jurisdiction is premised on diversity, the Court applies the law of the state in which it sits when neither party raises a conflict of law issue. *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010). Accordingly, the Court will apply Illinois law to Midwest's claims. Both parties agree with this approach. *See* R. 42; R. 43.

## ANALYSIS

GlobalTranz contends it is entitled to summary judgment for several reasons: (1) Midwest lacks standing to pursue the fraud and breach of contract claims (Counts I and III); (2) the fraud and negligence claims (Counts I and II) are preempted by federal statute; and (3) there is no issue of material fact as to any of the elements required for the claims in Counts I, II, or III. Additionally, GlobalTranz argues that Midwest's damages are limited to $3,450 on the breach of contract claim.

## I. Summary Judgment Based on Standing

GlobalTranz argues that Midwest lacks standing to pursue the fraud and breach of contract claims because GlobalTranz did not have an agreement with Midwest. R. 19 at 1-2. GlobalTranz claims that all of its communications regarding the shipments were with West Coast, and therefore, GlobalTranz could not have

entered into an agreement with Midwest. R. 19 at 9. In addition, the Terms and Conditions, which GlobalTranz claims applies to the shipping agreement at issue, contain a clause stating,

> <u>No Other Parties to Benefit</u>. This Agreement is made for the sole benefit of the Parties hereto and their successors and permitted assigns. Except as expressly provided herein, no other person or entity is intended to or shall have any rights or benefits hereunder, whether as third-party-beneficiaries or otherwise.

R. 20-3 at 21, ¶ 19.

The relationship between Midwest and West Coast is relevant. Initially, assuming the Terms and Conditions are a part of the agreement between the parties (which is in dispute, as discussed below), a third-party beneficiary would lack standing to pursue the claims at issue. Nevertheless, an agent may bind a principal to a contract while acting within the scope of its authority. *Lynch v. Bd. of Ed. of Collinsville Cmty. Unit Dist. No. 10*, 412 N.E.2d 447, 461-62 (Ill. 1980). Illinois courts define "agent" as "one who undertakes to manage some affairs to be transacted for another by his authority, on account of the latter, who is called the principal, and to render an account." *Wargel v. First Nat'l Bank*, 460 N.E.2d 331, 334 (Ill. App. Ct. 5th Dist. 1984). Whether one is an agent for another is generally a question of fact, though it becomes a question of law when the facts are undisputed. *Id.* There is no dispute in this case that West Coast was Midwest's agent or that West Coast was acting on behalf of Midwest when it negotiated, and entered into, the contract with GlobalTranz. *See* R. 32-2 ¶ 2. Thus, Midwest is not a third-party beneficiary, so the provision in the Terms and Conditions that GlobalTranz relies on

to argue that Midwest lacks standing to sue under the contract is of no help.

GlobalTranz alternatively contends that even if Midwest was West Coast's principal, Midwest still lacks standing because West Coast never disclosed Midwest's interest in the transaction when the shipments were booked—only learning of it after the shipments were stolen and Midwest submitted its claim to GlobalTranz, R. 20-4 ¶¶ 4-5. Contrary to GlobalTranz's argument, however, one of the long form bills of lading lists GlobalTranz as a third party, *see* R. 20-3 at 15, so it is at least conceivable that GlobalTranz was aware of Midwest's interest in the transaction. Nevertheless, even assuming Midwest was an "undisclosed principal," GlobalTranz's argument is still unavailing. Illinois courts have explained the legal significance of being an undisclosed principal:

> [W]hereas an undisclosed principal may step into the shoes of his agent and assume all the rights and obligations of a contract that the agent has entered into on the undisclosed principal's behalf (*Brunswick Leasing Corp. v. Wisconsin Cent., Ltd.*, 136 F.3d 521, 526 (7th Cir. 1998)), third parties are not afforded such a right.

*Reid v. Wells*, 721 N.E.2d 163, 166 (Ill. App. Ct. 3rd Dist. 1999). Furthermore, not only is Midwest an undisclosed principal, it is the *sole* undisclosed principal to the shipping agreement at issue between West Coast and GlobalTranz. It is thus "unquestionable that it [can] enforce the contract in its own right." *Brunswick*, 136 F.3d at 527 (citing *Rush-Presbyterian-St. Luke's Med. Cntr. v. Hellenic Republic*, 980 F.2d 449, 452-53 (7th Cir. 1992); *People ex rel. Ames v. Marx*, 18 N.E.t2d 915, 919 (Ill. 1938); *O'Connor v. Vill. of Palos Park*, 333 N.E.2d 276, 281 (Ill. App. Ct. 1st Dist. 1975); *Jovan v. Starr*, 231 N.E.2d 637, 639 (Ill. App. Ct. 1st Dist. 1967)). Thus,

Midwest has standing to pursue its claims.[3]

## II.    Summary Judgment Based on Preemption

GlobalTranz argues that it is entitled to summary judgment on the fraud and negligence claims in Counts I and II because the Interstate Commerce Commission Termination Act, 49 U.S.C. § 14501(c)(1) (the "ICCTA"), preempts all state law claims against transportation brokers like GlobalTranz, except those for breach of contract. R. 19 at 6-8. GlobalTranz argues that because claims such as fraud and negligence (Counts I and II) seek to impose conditions on a motor carrier's rates, routes, and services which exceed those voluntarily agreed upon by contract, Counts I and II are prohibited by the ICCTA. R. 19 at 7.

The ICCTA provides, in relevant part, that "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of the law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). This preemption provision is part of a broader deregulatory effort by Congress that covers both air and motor transportation. Accordingly, "the Supreme Court has generally taken the position that the statutes deregulating the airline industry and those deregulating the trucking industry should be construed consistently with one another." *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544, 548 (7th Cir. 2012). Thus, the Airline Deregulatory Act ("ADA")

---

[3] West Coast states that it is "ready, willing, and able to join the lawsuit whereby Midwest is seeking damages from GlobalTranz should it be determined necessary." R. 32-2 ¶ 16.

and the ICCTA preemption provisions will be addressed together, with the task of determining which of Midwest's state law claims qualifies as "a law, regulation, or other provision having the force and effect of law related to a price, route or service." *Id.* at 549.

### A. Case Law Interpreting the Regulations

The Supreme Court began its interpretation of the ADA in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992). In *Morales*, members of the National Association of Attorneys General ("NAAG") attempted to enforce guidelines regulating airline advertising, the awarding of premiums to "frequent fliers," and the payment of compensation to passengers who voluntarily yield their seats on overbooked flights pursuant to their powers under their states' consumer protection statutes. *Id.* at 379-80. The Supreme Court held that the ADA preempted all state enforcement actions that have "a connection with or reference to airline 'rates, routes, or services," regardless of whether the laws specifically referred to the airline industry. *Id.* at 384 (citing 49 U.S.C. App. § 1305(a)(1)). Therefore, because the NAAG guidelines "establish[ed] binding requirements as to how [airline] tickets may be marketed if they are to be sold at given prices," the Court determined that the regulations related to airline fares. *Morales*, 504 U.S. at 388.

However, the Court specifically disclaimed any intent to read the statute as preempting all state laws that might indirectly affect fares, routes, or services. For example, the Court indicated that state laws against gambling and prostitution would not be preempted as applied to airlines, and it specifically reserved the

question of whether laws regulating the non-price aspects of fare advertising, such as laws preventing obscene depictions, would similarly survive preemption. *Id.* at 390. The Court reaffirmed a prior holding that "'some state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Id.* (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)). *Morales* thus demonstrates that preemption is not a "simple all-or-nothing question; instead, the court must decide whether the state law at issue falls on the affirmative or negative side of the preemption line." *S.C. Johnson*, 697 F.3d at 550.

Three years later, *in American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995), the Court had an opportunity to further expound on its analysis in *Morales*. The *Wolens* case involved participants in an airline's frequent flyer program who alleged that retroactive changes to the program violated Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505, and constituted a breach of contract. *Wolens*, 513 U.S. at 224-25. The Court held that "[t]he ADA's preemption prescription bars state-imposed regulation of air carriers, but allows room for court enforcement of contract terms set by the parties themselves." *Id.* at 222. In doing so, the Court rejected a distinction between those activities that are peripheral to the operations of an airline and those that are essential. *Id.* at 226. The Court explained:

> [T]he [Illinois] Consumer Fraud Act serves as a means to guide and police the marketing practices of the airlines; the Act does not simply give effect to bargains offered by the airlines and accepted by airline customers. In light of the full text of the preemption clause, and of the ADA's purpose to leave largely to the airlines themselves, and not at all to States, the selection and design of marketing mechanisms

appropriate to the furnishing of air transportation services, we conclude that § 1305(a)(1) preempts plaintiffs' claims under the Consumer Fraud Act.

*Id.* at 228.

Like the decision in *Morales*, however, the Court in *Wolens* held that there are limits to the scope of preemption. While the ADA was designed to remove the states' authority to regulate the selection and design of marketing mechanisms, breach of contract claims fall outside the scope of the ADA's preemption provision. *Id.* Rather, the Court held that the ADA was designed to promote "maximum reliance on competitive market forces," *id.* at 230 (quoting 49 U.S.C. App. § 1302(a)(4)), and that "[m]arket efficiency requires effective means to enforce private agreements," *id.* at 230. Therefore, because "[a] remedy confined to a contract's terms simply holds parties to their agreements -- in this instance, to business judgments an airline made public about its rates and services," such claims are not preempted. *Id.* at 228-29 ("We do not read the ADA's preemption clause . . . to shelter airlines from suits alleging no violation of state-imposed obligations, but *seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings*.") (emphasis added).

In *Rowe v. New Hampshire Motor Transport Association*, 522 U.S. 364, 369 (2008), which dealt with preemption under the ICCTA, a group of carrier associations challenged a Maine statute that placed elaborate licensing and verification requirements on tobacco retailers. The Court, relying significantly on its decision in *Morales*, explained that the ICCTA preempts state actions that either

have a "connection with, or reference to" carrier rates, routes, or services; or that have a "'significant impact' related to Congress' deregulatory and pre-emption-related objectives." *Id.* at 370-71. The Court also explained, however, that as in the case of the ADA, "federal law might not pre-empt state laws that affect fares in only a tenuous, remote, or peripheral manner." *Id.* at 371 (quoting *Morales*, 504 U.S. at 390). Focusing on those parameters, the Court held that the regulation of shippers of tobacco imposes significant obligations on carriers if they are to contract with tobacco shippers by requiring them to offer services that they may not now provide, even if it does not directly affect motor carriers. *Id.* at 372. It concluded, "The Maine law thereby produces the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." *Id.*

In the most recent Supreme Court case addressing the issue, *Dan's City Used Cars, Inc. v. Pelkey*, the Court held that although the ICCTA's preemption provision largely tracks that of the ADA, "the [ICCTA] formulation contains one conspicuous alteration—the addition of the words 'with respect to the transportation of property.' That phrase 'massively limits the scope of preemption ordered by the [Federal Aviation Administration Authorization Act of 1994 ("FAAAA")]."[4] ___ U.S. ___, 133 S. Ct. 1769, 1778 (2013) (quoting *City of Columbus v. Ours Garage &*

---

[4] "[Section] 601(c) of the FAAAA supersedes state laws 'related to a price, route, or service of any motor carrier . . . *with respect to the transportation of property.*'" *Dan's City Used Cars*, 133 S. Ct. at 1776 (quoting 49 U.S.C. § 14501(c)(1)) (emphasis in original).

*Wrecker Serv.*, 536 U.S. 424, 449 (2002) (Scalia, J., dissenting)). Thus, in order to be preempted, a state law must relate to a carrier's rates, route, or service, as well as *concern a motor carrier's "transportation of property." Dan's City Used Cars*, 133 S. Ct. at 1778-79. Drawing on that additional caveat, the Court held that a plaintiff's claims for negligence and breach of statutory duties related to a towing company's improper disposal of a car were *not* preempted because the claims related to conduct that occurred *after* the car was towed, not to the towing itself. *Id.* at 1779. The Court's attention was on when the claim arose—when the services were rendered or at some other point in time, i.e., either before the transportation of property or after.

The Seventh Circuit has also had an opportunity to explain the scope of preemption. In *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996), the court interpreted the Supreme Court precedent at the time—*Morales* and *Wolens*—as indicating that a law "relates to" airline rates, routes, or services, "either [1] by expressly referring to them or [2] by having a significant economic effect upon them." In that case, a travel agency sued an airline for breach of contract, defamation, tortious interference, intentional infliction of emotional distress, and fraud after the airline made statements to the travel agency's customers impugning its business reputation and refused to transport customers that booked their tickets through the travel agency, rather than directly from the airline. *Id.* at 1427-28. In addition to the contract claims that were plainly permitted under *Morales* and *Wolens*, the court upheld the plaintiff's claims for

defamation because the defendant's defamatory statements about the travel agency were not "services" for which the parties bargained. *Id.* at 1433. The Court stated, "It is difficult for us to envision how allowing tort claims based on an airline's knowingly false statements about a travel agency would have even a 'tenuous, remote or peripheral' economic effect on the rates, routes, or services that the airline offers." *Id.* at 1433. On the other hand, the court held that the plaintiff's claims for tortious interference, intentional infliction of emotional distress, and fraud were more closely related to the defendant's services (and, therefore, preempted) because they dealt with the ticketing and transport of passengers. *Id.* at 1434-35. Although the plaintiffs argued that the actions of the defendant airline's employees "were not taken in the normal exercise of its business judgment," the court noted that the "subjective motivations of [the defendant airline's] employees [were] irrelevant to determining what constitutes 'services' within the meaning of the ADA." *Id.* at 1434. In short, the focus in determining preemption is on whether the claims relate to the way in which the defendant carried out the contracted-for "services." If they do, the claims will generally be preempted.

In *S.C. Johnson*, the Seventh Circuit had the benefit of its decision in *Travel All Over the World*, as well as the Supreme Court's decisions in *Morales*, *Wolens*, and *Rowe*. 697 F.3d at 557. The case involved a customer who brought state law claims against a shipping company for fraudulent misrepresentation, bribery, and violations of the state racketeering statute, alleging that the company engaged in a scheme of bribery and kickbacks that artificially raised prices. *Id.* at 545. In

addressing whether the FAAAA preempted the claims, the court concluded that the fraudulent misrepresentation claim was preempted, reasoning that the purpose of deregulation was to free carriers from the state-by-state imposition of consumer protection standards. *Id.* at 557. However, the court also concluded that the other claims were not preempted—i.e., the statutory claims under Wisconsin law for bribery and racketeering—because neither the bribery statute nor the racketeering statute "provide[d] non-bargained alternatives to the contractual terms that the parties selected." *Id.* at 558-61. The court stated:

> We have here state laws of general application that provide the backdrop for private ordering; it is not necessary or even helpful to lard a contract with clause after clause promising not to violate such laws, whether those laws are the anti-gambling laws to which the Supreme Court referred in *Morales* or they are minimum wage laws, safety regulations (as recognized in *Rowe*), zoning laws, laws prohibiting theft and embezzlement, or laws prohibiting bribery or racketeering. As *Rowe* put it, these are state regulations "that broadly prohibit[] certain forms of conduct" and that affect transportation companies (whether air or surface carriers) only in their capacity as members of the public.

*Id.* at 558 (quoting *Rowe*, 552 U.S. at 375).

### B. Application to This Case

#### 1. Count II: Negligence

Midwest alleges that GlobalTranz did not take the requisite degree of care in arranging for the shipment of the Midwest's cargo. Specifically, it alleges that the Defendants "breached their duty in failing to take steps necessary to assure the [l]oads were not stolen." R. 1-1 ¶ 32. Thus, as in *Travel All Over the World*, this allegation seeks to impose liability on the defendant for the manner in which it carried out its contracted-for services. *See* 73 F.3d at 1434. Additionally,

GlobalTranz's service in brokering cargo for shipment in interstate transit clearly concerns the transportation of property. *See Dan's City Used Cars*, 133 S. Ct. at 1778-79. The claim relates to what happened *during* the shipment of the tablets, as opposed to what may have occurred before or after their transit. Midwest's negligence claim in Count II is, therefore, preempted.[5]

### 2. Count I: Fraud

Midwest's fraud claim presents a closer question. Midwest alleges that "GlobalTranz feigned that it would actually provide insurance on the [l]oads when it in fact knew that it would not," and as a result "Midwest detrimentally relied on GlobalTranz['s] misrepresentation that GlobalTranz would actually provide insurance for the [l]oads." R. 1-1 at 8. It is true that, in some sense, Midwest's fraud allegation seeks to impose a state requirement that parties not make knowing misrepresentations to each other when entering into a contract. For this reason, the precedent cited above is consistent in preempting actions based on consumer fraud statutes. *See Wolens*, 513 U.S. at 228. However, in this case, Midwest's claims do not relate to GlobalTranz's conduct in brokering the cargo. Rather, Midwest is claiming it was fraudulently induced into *entering into a contract* with GlobalTranz—i.e., it would not have paid GlobalTranz and allowed GlobalTranz to transport its shipments of Android tablets if it knew GlobalTranz would not procure

---

[5] Midwest alleges that GlobalTranz, American Freight, and V & R Trucking had a duty to "ensure that the Loads were insured at all times while the Loads were in their possession." R. 1-1 ¶ 31. This duty could only arise if the parties contracted for insurance, so it is really a breach of contract claim disguised as a negligence claim. This allegation in Count II is duplicative of the allegations in Count III and, thus, does not preclude the dismissal of Count II as a whole.

insurance. That claim relates to pre-transportation conduct, as opposed to how any contracted-for services of GlobalTranz were carried out. Accordingly, because post-transportation conduct is not preempted, as it does not concern the transportation of property (or relate to contracted-for services), *see Dan's City Used Cars*, 133 S. Ct. at 1779; *Travel All Over the World*, 73 F.3d at 1433-34, neither is the pre-transportation conduct at issue here. The fraud claim does not relate to a "service" that a motor carrier provides its customers. *See id.*

Moreover, Midwest is seeking compensation for a violation of the common law prohibition on fraudulently misrepresenting the terms of an agreement, rather than seeking to enforce a state's statutory rules governing contracts. Accordingly, enforcing the common law prohibition on fraud in this case will simply hold the parties to their bargained-for expectation. *See Rowe*, 552 U.S. at 372. It will not involve imposing a state's substitution of its own governance for competitive market forces. Just as the bribery statute in *S.C. Johnson* was not preempted because it merely "provide[d] the backdrop for private ordering," 697 F.3d at 558, prohibiting parties from misrepresenting the terms of a contract provides a generally-applicable rule that affects a carrier's rates and service only in its capacity as a member of the general public. Allowing Midwest's fraud claim to proceed is appropriate given it simply holds parties accountable for their representations of material fact when entering into an agreement, which is no different than what parties must do in any other market. This is consistent with the goal of the ICCTA: to promote "maximum reliance on competitive market forces." *See Wolens*, 513 U.S. at 230.

Requiring parties to be honest and forthright about their services might cause a legitimate company to charge higher prices than one that is not so scrupulous—i.e., a company that intentionally dupes its customers into paying for services that are not actually provided. However, such an effect is, at most, tenuously related to a carrier's rates with respect to the preemption elements. And the Seventh Circuit has explicitly rejected the claim that any state law that increases the cost of doing business is preempted. *See S.C. Johnson*, 697 F.3d at 558 (explaining that "minimum wage laws, worker-safety laws, anti-discrimination laws, and pension regulations" ultimately affect the costs of market transactions, "[y]et no one thinks that the ADA or the FAAAA preempts these and the many comparable state laws"). The important question is whether a plaintiff's state law claims are an attempt to "change the bargain that the parties had reached." *Id.* A contract claim is not preempted simply because holding a party to its agreement might cause the party to charge more for its services than if it were free to simply walk away from any contract that became unprofitable. The same logic applies to Midwest's fraud claim, which is not preempted simply because it requires parties to be truthful when negotiating terms, even if it may later impose additional costs on the party that was not.

## III. Summary Judgment Based on Uncontested Facts

### A. Count I: Fraud

GlobalTranz alternatively argues that it is entitled to summary judgment on Midwest's fraud claim in Count II because there is no dispute as to any issue of

material fact. To prove a claim for fraudulent misrepresentation in Illinois, a plaintiff must show: (1) a false statement of material fact; (2) knowledge or belief of the falsity by the person making it; (3) intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; and (5) damage to the other party resulting from such reliance. *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 973 N.E.2d 880, 889 (Ill. 2012).

Midwest claims that (1) GlobalTranz knowingly misrepresented that it would insure Midwest's cargo in order to induce the Plaintiff to use its brokerage services; (2) that Midwest relied on this claim in choosing to contract with GlobalTranz; and (3) that Midwest has not been able to recover its losses from the theft of its cargo because of the misrepresentation. R. 1-1 ¶¶ 20-28. In support of these allegations, Midwest submitted the affidavit of Saboo who asserts: "GlobalTranz quoted a price which included insurance against the loss or theft of tablets during shipment. This was confirmed by GlobalTranz's employee Gengler." R. 29-2 ¶ 6. Additional evidence in support of the fraud claim are e-mails between Gengler and Saboo on February 2, 2012, in which Saboo asked Gengler to "confirm[] that we did pay the additional premium on freight in order to cover the value of the goods which I told you was $800,000 or so." R. 44-3 at 2. Gengler responded, "Vinay with Westcoast (sic) Imports purchased addtl insurance: For the NC load, $800.00 insurance was purchased. For the TX shipment, $250.00 was purchased." *Id.* Saboo requested clarification on the dollar amount of the insurance and Gengler responded: "Westcoast (sic) Imports purchased addtl insurance for HEB and Variety Wholesale.

HEB - $250,000 insurance was purchased. Variety Wholesale - $450,000 was purchased." *Id.* at 1. Furthermore, Saboo states in his affidavit, "Midwest instructed me to not ship the loads with GlobalTranz if GlobalTranz was unwilling or unable to insure the loads." R. 29-2 ¶ 5. Aziz confirms that in his affidavit, stating, "Midwest would not have agreed to ship the loads with GlobalTranz if GlobalTranz [was] unwilling or unable to insure the loads" and that it only told West Coast to place its order after receiving confirmation of insurance. R. 29-1 ¶ 4. In contrast, GlobalTranz denies ever making any statement offering to insure Midwest's shipments. There is no dispute that GlobalTranz did not, in fact, insure the shipments.

Whether GlobalTranz made a false statement of material fact is an essential element of Midwest's fraud claim. *McLean Cnty.*, 973 N.E.2d at 889. Therefore, because there is a contested issue of fact as to whether any statement or assurance regarding insurance was made, summary judgment in favor of GlobalTranz on Count I is denied.

### B. Count III: Breach of Contract

To recover on a claim for breach of contract, a plaintiff must establish "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007); *see Finch v. Ill. Cmty. Coll. Bd.*, 734 N.E.2d 106, 110 (Ill. App. Ct. 5th Dist. 2000). When reviewing a contract, a court must consider the contract as a whole as well as

determine the intent of the parties. *See Wilson v. Wilson*, 577 N.E.2d 1323 (Ill. App. Ct. 5th Dist. 1991). Midwest's claim is based on its assertion that its contract with GlobalTranz required GlobalTranz to procure insurance on its behalf, yet GlobalTranz did not do so. R. 1-1 ¶¶ 37-39. GlobalTranz argues it is entitled to summary judgment on Midwest's breach of contract claim because it did not have any obligation under the contract regarding insurance, and thus, Midwest cannot demonstrate that it breached the contract.

There is a clear factual dispute as to whether GlobalTranz and Midwest (through West Coast) contracted for GlobalTranz to provide insurance for the shipments at issue. As discussed regarding the fraud claim, the affidavits of Saboo and Aziz support the notion that the contract *must* have included the requirement that GlobalTranz obtain insurance because Midwest otherwise would not have chosen GlobalTranz. *See* R. 29-1; R. 29-2. The emails between the parties from February 2, 2012, *see* R. 44-3, also go towards whether insurance was included in their contract. Again, in contrast, GlobalTranz has repeatedly denied that it offered insurance on the shipments. R. 8 ¶ 12; R. 19 at 3; R. 20 ¶ 8. Notably, Gengler states in his affidavit that he did not offer, nor did West Coast purchase, any insurance for the loads. R. 20-4 ¶ 7.

The Court has not been provided with one explicit, written contract between the parties encompassing all the terms of the agreement, so normally this disagreement would constitute a material factual dispute and preclude summary judgment. However, GlobalTranz argues that the parties (at least, GlobalTranz and

West Coast) have an extensive course of dealing and that each prior transaction was accompanied by an invoice referencing the Terms and Conditions that appear on the GlobalTranz website. R. 19 at 10-12; *see* R. 20-3 at 19-22. These Terms and Conditions expressly disclaim GlobalTranz's liability for lost shipments and state that "the Customer will look solely to the insurance provided by the carrier for damage to goods in transit." R. 20-3 at 20. Therefore, GlobalTranz argues that the disclaimers were implied terms of the contract through their course of dealing and that, as a matter of law, GlobalTranz's failure to insure the shipments cannot constitute a breach of contract.

A course of dealing is a "sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *Capitol Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391, 395 (7th Cir. 1992) (quoting Ill. Rev. Stat. ch. 26, ¶ 1–205(1)). A course of dealing may become part of an agreement either by "explicit provisions of the agreement or by tacit recognition." *Capitol Converting Equip., Inc.*, 965 F.2d at 396 (quoting U.C.C. Official Cmt. 3). Whether a course of dealing exists between parties to a transaction is a question of fact. *Gord Indus. Plastics Inc. v. Aubrey Mfg., Inc.,* 431 N.E.2d 445, 449 (Ill. App. Ct. 2d Dist. 1982). Nevertheless, while the parties' previous conduct may give "particular meaning to and supplement or qualify the terms of their later agreement," it does not modify the agreement. *Capitol Converting Equip.*, 965 F.2d at 395 (quoting Ill. Rev. Stat. ch. 26, § 1-205(1)). It simply "reveals the bargain of

the parties in fact . . . informing the nature and the extent of the parties' obligation to each other." *Id.* at 396; *see also In re Elcona Homes Corp.,* 863 F.2d 483, 487 (7th Cir. 1988) (explaining that a practice does not modify a contract but may be evidence of an obligation).

GlobalTranz is correct that a course of dealing can be sufficient to incorporate terms and conditions contained in another document. Where an agreement is silent on a particular term, a course of dealing may fill the void. *See Gord Indus. Plastics,* 431 N.E.2d at 449-50 (explaining that a course of dealing may "give particular meaning to and supplement or qualify terms of an agreement" (quoting Ill Rev. Stat. 1975, ch. 26, par. 1 -- 205(3))). Thus, in the absence of any expressed intent to provide insurance, GlobalTranz's disclaimer of any insurance obligation would indeed inform the interpretation of the contract. However, the parties' prior course of conduct merely assists the court in interpreting the parties' intent; it does not prevent the parties from reaching an alternative agreement with different terms than in the past—which they could have done here: the parties might have agreed upon insurance for these two particular loads of Android tablets. Even paragraph 10 of the Terms and Conditions, which contains the insurance disclaimer, states: "GlobalTranz may have optional Shippers Interest Contingent Cargo Liability Insurance ("Third Party Insurance") available for purchase by Customer." R. 20-3 at 20. Additionally, GlobalTranz admits that it had only one prior transaction involving Midwest, *see* R. 20-2 ¶ 11; R. 20-3 at 18, so its general course of dealing with West Coast for other principals is certainly not dispositive. Saboo stated in his

affidavit, "For West Coast the contract or agreement between Midwest and GlobalTranz is (a) the emails between the parties establishing the load descriptions, the price, and the insurance, and (b) the bills of lading." R. 32-2 ¶ 15. If Saboo's statement is true and that is all their agreement included, the Terms and Conditions on GlobalTranz's website, which include the general insurance disclaimer and other contract terms, would *not* be included in the parties agreement here.

Moreover, GlobalTranz essentially confirmed that it had obtained insurance for Midwest's shipments when Gengler stated in his emails that West Coast had purchased additional insurance for the loads. *See* R. 44-3 at 2. While this admission occurred after the shipments had been stolen, there is seemingly no reason for GlobalTranz to expressly admit that it had obtained insurance if it (1) had not done so, or (2) had no obligation to do so. Taking this fact in the light most favorable to Midwest for the purposes of summary judgment, there is evidence that GlobalTranz agreed to provide insurance on these shipments. This evidence, coupled with the affidavits from Saboo and Aziz, demonstrates a disputed issue of material fact as to whether the contract between Midwest and GlobalTranz included an obligation on the part of GlobalTranz to obtain insurance for the shipment. Summary judgment is thus denied as to Count III.

## IV.    Limitation on Damages

GlobalTranz claims that even if Midwest could recover for breach of contract, any resulting damages are limited to $3,450 because the Terms and Conditions

limit its liability to the fees paid under the contract. R. 37 at 11. The Terms and

Conditions provide in part:

> Customer acknowledges that in order to provide competitive rates for the services, that the parties have agreed as a material term of this Agreement that the burden on any loss or damage incurred as a result of GlobalTranz's alleged liability has been shifted to the Customer, and *that in any event the maximum amount of GlobalTranz's liability is limited to the fees that GlobalTranz has earned with respect to the subject shipment.* Customer specifically acknowledges that GlobalTranz shall have no liability for negligent acts or omissions of its employees except to the extent such actions or omissions constituted gross negligence.

R. 20-3 at 20, ¶ 9 (emphasis added).

As discussed above, GlobalTranz argues that the extensive course of dealing

between West Coast and GlobalTranz in which West Coast (for numerous other

transactions not involving Midwest) submitted payment on a form containing a

reference to the Terms and Conditions is sufficient to imply those terms into the

contract at hand. However, as with the matter of the insurance-obligation question,

the parties' prior course of dealing merely informs the interpretation of a contract; it

does not modify negotiated terms. In this case, there is a dispute over whether the

parties contracted for insurance. There is also a dispute as to whether the Terms

and Conditions were a part of the agreement at issue here. *See* R. 32-2 ¶ 14 ("No

one at West Coast ever read the terms and conditions found on GlobalTranz website

www.carrierrate.com. West Coast did not consider them to be part of the contract or

agreement between Midwest and GlobalTranz."); *see also id.* ¶ 15. Courts have held

that parties may be bound by terms that are incorporated into an agreement, even

if they are explained more fully somewhere else, if the party is given proper notice

and the parties intend for them to be a part of the agreement. *See, e.g.*, *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 266-69 (5th Cir. 2011); *see also Lozano v. United Continental Holdings, Inc.*, No. 11 C 8258, 2012 WL 4094648, at *3 (N.D. Ill. Sept. 17, 2012) ("As the Seventh Circuit has summarized, 'a document is incorporated by reference into the parties' contract only if the parties intended its incorporation.'" (quoting *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002)); *but see Trujillo v. Apple Computer, Inc.*, 578 F. Supp. 2d 979, 989-95 (N.D. Ill. 2008) (declining to enforce an arbitration clause due to a lack of notice and reasonable access to the company's "terms of service"). However, both Coronado (on behalf of West Coast) and Aziz (on behalf of Midwest) deny having signed the credit application, R. 25-3; R. 25-4, and despite GlobalTranz's assertion that a customer cannot book a shipment on-line without checking a box stating "I agree to terms of agreement," R. 36-2 ¶¶ 11-12, this shipment was not booked through GlobalTranz's website. Coronado did it via direct email with Gengler, R. 44-1 ¶ 3, which would not have required her to check any box.

Moreover, a limit on GlobalTranz's liability to a mere $3,450 would defeat the purpose of an insurance agreement on the more than $600,000 worth of cargo. It would not make sense for Midwest to pay a higher fee for added protection on the shipments, yet not actually be entitled to afford themselves of that protection if GlobalTranz did not satisfy its obligations under the agreement. Accordingly, the dispute over whether the parties intended to contract for insurance is also material as to whether the limitation on liability contained in the Terms and Conditions is a

term of the contract.

In sum, if West Coast and GlobalTranz agreed to certain terms that differed from terms previously agreed to, the parties' prior course of dealing cannot be said to substitute those past terms for those actually agreed to in the transaction at hand. *Capitol Converting Equip.*, 965 F.2d at 395-96 ("Where . . . an agreement is silent on a particular term, a course of dealing may fill the void. . . . Here, the parties' course of dealing supplemented their oral agreement which was silent as to [the issue before the court]."). Thus, there is a factual dispute as to whether the parties agreed to a damage-limitation clause for these particular shipments.[6]

## CONCLUSION

GlobalTranz's motion for summary judgment, R. 18, is granted as to Midwest's negligence claim in Count II. The motion is denied as to the fraud claim in Count I and the breach of contract claim in Count III.

As a final matter, under Illinois law, a breach of a contractual promise "without more" does not constitute fraud. *See Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 901 (7th Cir. 2006); *Firstar Bank, N.A. v. Faul*, No. 00 C 4061, 2001 WL 1636430, at *4 (N.D. Ill. Dec. 20, 2001). "In other words, for a defendant to be liable under both theories of breach of contract and fraud, the defendant must have breached the contract in a fraudulent manner." *Oh. Nat'l Life Assurance Corp. v. Davis*, ___ F. Supp. 2d ___, No. 10 C 2386, 2014 WL 500539, at *4 n.4 (N.D. Ill. Feb. 7, 2014). There is no evidence of GlobalTranz "fraudulently" breaching any alleged

---

[6] Any damage limitation that could be contained in the agreement would not apply to the fraud claim in Count I.

term of the contract. Accordingly, at trial, Midwest may pursue both its fraud and breach of contract claims, but it is legally impossible in this case for it to recover on both. If the jury finds in favor of Midwest on its fraud claim, then the parties did not have a valid contract that included insurance because there was no meeting of the minds. Alternatively, if there was a contract that was breached, then there was no disagreement on terms, and under these facts, GlobalTranz could not have fraudulently induced Midwest to enter into a contract.

The parties are directed to appear at a status hearing on August 5, 2014, at 9:00 a.m. to discuss a prompt trial date. Lead trial counsel should be present.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: July 23, 2014